We'll begin with argument on behalf of the appellant, Mr. Leonard. Good morning. May it please the court. Mike Leonard on behalf of appellant Andrew Boltz. We seek reversal of his conviction or in the alternative, a new trial. This case presents difficult issues to talk about. You didn't appeal count two, it doesn't look like. That is correct. So, there's nothing to talk about with respect to count two, the 241 sentence, and he just wants a new trial on counts one through three and count five. Correct. Okay. I'd like to reference the fact that although this creates difficult issues to talk about, to consider, to read about, Mr. Boltz was not entitled to any level less of due process or a fair trial or the right to legitimately confront and cross-examine witnesses and to prepare and present a complete defense to the jury, which he was denied in this case. I'd like to talk first about the destruction of the material evidence issue. Here, after both local law enforcement and the FBI got involved, they took control and possession of something very important to the case, which was Arianna S.'s Snapchat account. However, after taking control of that account, they still allowed her to access that account and to delete entirely all of her Snapchat messages with Mr. Boltz, thousands of them. Mr. Linner, can I ask you a serious question? Does any of that matter? And here's why I ask this question. As long as Mr. Boltz is asking her to send him sexually explicit photos, which he was doing, doesn't that violate the statute? Whether she had this proclivity to do it, whether she had it with somebody else, whether she wanted to do it, does any of that matter under the law? It does. And what's important on each account and each alleged transaction is context. And as the government's own witness, their lead case agent or co-case agent, Agent Lando, admitted that with the destruction of essentially half the evidence, which when the government called Arianna S. on the phone, they said, what happened? We lost half our evidence. What did you do? That was significant to them at the time. They didn't disclose it to us, but that was significant. Why it matters, and as Agent Lando admitted in a cross-examination, each account requires contextual interpretation of what happened. The problem, Your Honor, is that she was simultaneously using Snapchat to communicate with Mr. Boltz while they're doing the video stuff and Facebook stuff. So you don't have the context. What I'm saying is, what could she have said in the destructed evidence that would have mattered with respect to the defense? Give me a hypothetical example. Oh, easily, just like in the evidence that was elicited before the jury. For example, I'm going to send you this, or I just sent you this. The government had to show, beyond a reasonable doubt as to each count, that that happened because of persuasion, enticement, or inducement. It's not enough for a minor to send us a sexual picture, and that's what the law recognizes. So without the complete context of the Snapchat communication, which accompanied whatever else they were doing, you don't have the context, Your Honor. But I suppose I'm trying to push you on this. What I suppose is, really, isn't all that matters his communication to her, not her communication to him? Because this is a little odd, or it's a little different, in that the victim here is 16 years old. Sure. But imagine if the victim was 10 or 8. None of us would say that an 8-year-old could be able to say to an adult man, I want to send you sexually explicit photos. Correct, Your Honor. You're right about that, but the same legal standard would apply. Right. Because if an 8-year-old or 10-year-old does send us something, they still have to show persuasion, enticement, or inducement. Why it matters in this case, what she said, it's 100% relevant. It's in context to whether she's doing this on her own. It's not a consent, it's a voluntariness without persuasion, inducement, or enticement, which is a tough law to drive. Don't we have his messages to her soliciting or encouraging, at least, these sexually explicit photos and videos? We have part of it, Judge. So again, when they're interacting, she's doing Snapchat, which is her typing or making verbal statements. And we have his statements, but we don't have her Snapchat. So respectfully, we don't have the complete context to that communication. And as a government witness admitted, without that context, we can't tell. And we do know from other communications that were in evidence that there were certainly occasions, maybe many of them, where she did do that, where there wasn't an inducement, enticement, or persuasion, and she still did that very conduct. Mr. Leonard, is there a constitutional defense that you're pressing under Rule 412, or has that been waived? It has been waived, Judge. It is. It has not been waived. What happened before Judge Blakey is that Judge Blakey raised with us, counsel, you have not moved in limine to admit specific acts of sexual misadventure, whatever term you want to use. We explained to him, we have no intent to introduce specific acts of sexual activities by this victim, Arianna. We're not intending to do that, Judge Blakey. And we said 412 doesn't apply, because we're not trying to do either of the that she had a predisposition, because she did this all the time, to voluntarily send sexual explicit videos or pictures without persuasion, inducement, or enticement. So then in our post-trial motion, we argued, just like we had a trial, the due process part of it, but we also did for the first time, Your Honor, argue under 412 there was an exception. And Judge Blakey said, aha, I've already covered that, because you made that constitutional argument at trial. Even though you said 412 didn't apply, you were making a due process argument. So we never waived it. Even though we didn't say it was an exception, because 412 doesn't apply, we specifically argued that he was being denied due process in a fair trial, which is an exception. And Judge Blakey went out of his way in his opinion on our post-trial motions to make that point clear. So I don't think that was waived, Your Honor. I would like to talk about what was just pure prejudice in terms of the introduction of evidence with regard to Minor C from Norwalk, Ohio. It had absolutely nothing to do with the charge counts. It did not make more or less likely or probable that Mr. Boltz persuaded or induced or enticed on those four counts this individual to send a picture. Likewise, it had nothing to do with whether he ever received something from Ariane S. It was pure prejudice. Mr. Leonard, how do you respond then to the government's argument that it goes to identity and modus operandi? Yeah, I think, well, modus operandi is a new one that they raised at the time. I think they were flat-footed. They said to Judge Blakey, we're relying upon identity only. There was nothing to do with identity that was put in issue. Why wasn't the door opened by the mother's testimony? In terms of which door, Judge? The identity issue. The mother had nothing to do with identity. All the mother did was, first of all, the government, we put the mother on over our objection. We objected to her testifying at all. That's one of the prongs of our arguments that was completely irrelevant to the case, was used to garner sympathy. The mother, we didn't contest identity through her. They put her on. They can't put identity at issue by calling the mom who we objected to testifying at a trial at all. So I don't think that's relevant. But you're objecting to the fact that there was a door opening. You're saying the door wasn't opened to minor C from Norwalk. Absolutely not. The argument, Judge, they actually made with the door open argument was with regard to a different witness. The wife, the former wife of Mr. Boltz testified. So I think that's what you're referring to. And what she did was she came in with clear bias, a clear motive to testify falsely, which we explored on cross. And we just pointed out that not only was she that biased, she was essentially willing to say anything because she admitted on cross that the supposed golden glove testimony she was giving was baseless. That could have been anyone else in that household. So we never contested in opening argument, closing statement, in any argument we made that Mr. Boltz wasn't the guy. The case was decided, won or lost, on persuade, induced, or enticed. And that allowance of- So he didn't elicit any testimony that would suggest that perhaps someone else either used his phone to send the messages or the pictures of Milt Gentile were not his own? None of that came out? I don't think so. I mean, the way we handled the, sorry for my friends, the penis testimony from the ex-wife, wants to show, hey, look, you have a bias. You don't even know who that is, right? But we never contested that Andrew Boltz sent any of these communication. And when you vigorously cross-examine somebody, including an expert on forensics with regard to the phone, there's nothing that puts identity at issue, especially when this same individual, Arion S., was interacting with various other men. So it is relevant to know the scope of the electronic surveillance in terms of the phone drop and all that sort. So I don't think we put that at issue. I'd also like, as Your Honor touched upon, the 412 issue was a glaring central issue in the case. And it was a situation where 412 did not apply. We were not seeking in any way to introduce any specific acts. We didn't even want to introduce the pictures of her interacting with other people or to talk about what they were doing, what sex acts they were doing, who it was with, anything like that. We just wanted to elicit, because the door had been widely opened by the government, to show that she did regularly send those kind of pictures and videos without persuasion, enticement, or inducement. And on the one hand, the government wants to argue in a brief, hey, this is a real narrow case. We just have to look at each conversation. But yet, in their direct examination of Ariana, they went out of their way to get into her mental health, the fact that she was into dominating and submissive sexual behaviors, that she was into what they called animal sexual-related issues. But yet, when we tried to hold on here, if an individual regularly sends without inducement or enticement or persuasion these types of things, we should be able to introduce that, in any event, just at least in rebuttal to what the government just did in their direct examination. All right. We'll be giving you some rebuttal time. Thank you, Mr. Leiva. Thank you. Thank you. Mr. Leiva, we'll now move to you for argument on behalf of the government. May it please the court. Edward Leiva on behalf of the United States. The district court did not err in any of the rulings at issue on this appeal. And I'll start where we left off on the 412 issue. The evidence that the defendant sought to admit clearly falls within the scope of Rule 412 as either sexual behavior or sexual predisposition. No exceptions apply. And in any event, the defendant did not comply with the notice requirements under Rule 412. The district court did not abuse its discretion in excluding that evidence. Are you advancing one of those prongs over the other, or is it either? Judge, I think it's either. I think the district court held that it was either. I think the committee notes explain that the language of the rule should be broadly interpreted. There's the Ogden case from the Sixth Circuit and the Walker case from the Eighth Circuit. Both of those speak in terms of sexual predisposition, but I think that sexual behavior also applies, which applies to activities of the mind, including fantasies, dreams. And then on sexual predisposition, that would apply to a victim's mode of dress, speech, or lifestyle. And again, in the Ogden and the Walker cases, similar communications between a victim and other individuals was considered Rule 412 evidence. How should we handle this Zephyr case from the Eighth Circuit? That case is distinguishable for a couple of reasons. First, that was a sexual assault case, and the evidence that was sought to be admitted was a prior sexual assault. So it wasn't voluntary actions of a minor, so that's one difference. But in that case, there was expert testimony presented by the government that suggested that a victim of sexual assault is likely to act in a certain manner. Whether the sexual conduct was consensual was disputed in that case, and the evidence was not overwhelming. So the rebuttal evidence that the victim had been sexually assaulted on a prior occasion was directly relevant to the defendant's defense in that case. Here, the proffered evidence has no relevance to any defense because voluntariness or consent, which is what the defendant repeatedly talks about, whether she voluntarily did it with other individuals makes it more likely that she voluntarily did it with the defendant here. That's simply not relevant in a 2251A case. The defendant certainly has a right to present a complete defense, but number one, it has to be relevant, and restrictions can be put in place where the restrictions are not arbitrary or disproportionate to the goals that the restriction is aiming to advance. And so here, it's not relevant at all. To Judge Kershaw's point, there's nothing that she could have done to negate the actions that he was taking. And on the four exploitation counts, there is very specific language that the defendant used on each occasion. Count one, I want a vid, vibrator, send it, save it, then send it in chat. Count three, pull your boxers down. I want to see any references, what he wants to see. Count four is the likely Snapchat video on webcam where he's giving her direction on what he wants to see, and she testified that she was complying with that. And then count five, you know, show me when she says she's in the shower. So he's directing this conduct. He's employing, using, persuading, inducing, and enticing her to engage in this conduct. And so whether she voluntarily did it on a prior occasion really has no relevance here. Moving to the 404B issue, as your Honor noted, the defendant clearly opened the door to this evidence when he put identity at issue. And he did it in two ways, and I just want to back up for a moment. Pre-trial, the government filed a motion in limine, and we said we've got these video clips ready to present at trial if the defendant pursues certain defenses, including challenging that he was the one sending the messages. Sure enough, at trial, on the second and third witnesses in the case, the defendant challenged that the defendant was the one sending the messages. He did it with the Ohio law enforcement officer when he suggested that anyone, including visitors in the house or other people who are living in the house, may have been sending messages from the phone number that the defendant used to communicate with the victim. And then he did it with the mother of the defendant's child when he suggested that the images of male genitalia that were recovered from the victim's phone could have belonged to the defendant's brother or father. So when he put identity at issue, the probative value of the evidence from these video clips became more important, and the government sought to admit it. The court then engaged in the proper test as set forth in Gomez by identifying first a propensity free chain of reasoning for admitting the evidence, and the one that the government focused on was identity for the reasons I just articulated. And as this court noted in Gomez, one accepted way to use other act evidence to prove identity is to argue that the perpetrator had a distinctive modus operandi, and that was cited, modus operandi was cited by the district court because what the video clip showed is that this defendant had a very specific way of communicating with minor victims, which is to meet them on Omegle where you can meet strangers, move the communications to Snapchat where you have disappearing messages, and then exchanging sexually explicit conduct, including sending images of his genitals to this other minor and receiving an image of her in the shower. And so there's a non-propensity purpose for this evidence, and the court also correctly engaged in the 403 balancing test and determined that the probative value was not outweighed by the risk of unfair prejudice. And while the evidence certainly was prejudicial, the question, as this court acknowledged in Chambers, is whether it's unfairly prejudicial. And it wasn't, and it wasn't for a number of reasons. First, the way the government presented the evidence, these were very short, sanitized clips from that interview, which the district court acknowledged, where there were discrete facts, the ones I just articulated, were covered. The government did not include the Snapchat messages between the defendant and minor C, which we referenced in our GVO at sentencing, which are very graphic. The government did not introduce testimony that the defendant had sex with this other minor at trial, so we avoided some of the more prejudicial portions of that interview and admitted limited excerpts. Number two, there was a limiting instruction, both before the evidence was admitted and before the case was presented to the jury through the jury instructions. And finally, the government only argued this evidence the way it said it would, which is in relation to identity. There's a passing reference to it. Some of the clips were played in closing during the portion that related to proving the defendant's identity. Moving on to the destruction argument, the district court did not abuse its discretion in denying the defendant's motion for a new trial based on an alleged failure to preserve evidence. This argument is governed by young blood, and in order to prevail on a young blood claim, the defendant needs to make three showings. Number one, that the government acted in bad faith. Number two, that the exculpatory nature of the material was apparent. And number three, that the evidence could not be obtained elsewhere. This suggestion that the jury was presented with a one-sided view of the evidence is just not consistent with what the jury actually saw. There were numerous exhibits, including numerous Snapchat communications, where the jury saw both the victim's statements as well as the defendant's statements. And that included her statements that kids and pets were her weakness. That included statements confirming she was 16, that she had mental disorders, that she was insecure and vulnerable. And so this notion that we didn't ever see what the victim was saying is just not consistent with the record. Moreover, to Judge Kirsch's point, there's nothing that the victim could have said given the evidence in this case to negate that he was employing, using, persuading, inducing, or enticing her. So there's no exculpatory value to the messages that law enforcement saw, nor is there any evidence of bad faith. The defendant has not put forth any bad faith, nor could he, based on the extensive efforts law enforcement engaged in. Because he cannot make either of these showings, this claim also fails. Mr. Levy, can I ask you a question? Is it the government's position that in order to entice or induce that the defendant has to entice or induce each specific individual photo, or is it enough that the defendant induced a course of conduct which then caused the plaintiff to send a series of photos? In other words, what's the level of, I forgot what the term of art is, the level of prosecution. Is it one solicitation per one photo per one count? You know, you see, if the defendant solicits photos and the defendant sends 12 photos, is that 12 counts or is that one count? Well, Judge, what I can say is the way— The unit of prosecution, I think, is the term. Yes, so I think the unit of prosecution in this case was four specific instances, four specific dates, and we cited particular exhibits, either Snapchat exhibits or text messages where he engaged in the, you know, employing— Yes, it doesn't matter basically the way you charge in this case. I think that's right, based on this case. I will say, but we did rely on a broader set of evidence. In addition to the direct communications, there was also the broader testimony and evidence on who this victim was, who she was when the defendant met her in terms of her vulnerabilities, her insecurities, and that also came in through the testimony of the mother, which we think was relevant, and the district court correctly found was properly admitted. Thank you, Mr. Oliva. Thank you. Mr. Leonard, we'll go back to you. Two minutes for rebuttal, please. Thank you. I'd just like to address a couple issues that Mr. Oliva raised. With regard to the 412 issue, there would have been no reason for us to make a motion because we had no intent to introduce any specific acts of sex or sexual predisposition, and even after the government opened the door on the direct examination of Arianne S, that still was not our intent, but what they did and what Mr. Oliva did mention is they went out of their way in a calculated, intentional way in a direct examination of Arianne S to establish that she had actually been on the Omega site talking to strangers for six or seven years. However, and they provided more detail to that, more grounding in that, however, when we wanted to say, wait, hold on, it's relevant to if she's doing that for six or seven years and providing strangers voluntarily without persuasion, inducement, or enticement, certainly irrelevant to whether she would have done it in this case. Instead, the jury was left with this skewed view of this kid who's just on Omega talking to strangers to get to know them when the truth is something quite different. With regard to the destruction issue, it shouldn't be any less troublesome to this court that it's the victim rather than law enforcement who brings about the destruction of the evidence. It's no less of a burden to Mr. and detriment to Mr. Boltz's trial rights that she caused it versus them. The focus should be on prejudice to Mr. Boltz. What is your best evidence of bad faith? Well, that's the thing. We know in two respects why. We can't say the government intentionally did it or she intentionally did it, but the net result, Your Honor, was we're going to trial, or we found out at trial, that, hey, we're going to try a case that's all about context to conversations. Would you agree in advance that we'll just give you one side, you don't get the other side, and so you only get your own words, you don't get the other side's words? Of course, that's prejudice. So even if there's bad faith or not, it doesn't matter. The net result is a violation of Mr. Boltz's constitutional rights. Mr. Leonard, no reply brief was filed here. Any reason for that? No. Just so you're aware, 13 months ago, our court had a case called Clark. So in the future, we encourage reply briefs. I didn't know that. Thank you. Thank you. Thank you, Mr. Leonard. Thank you, Mr. Oliva. The case will be taken under advisement.